# BATES ET AL. *v.* DOW AGROSCIENCES LLC

No. 03–388.   Argued January 10, 2005—Decided April 27, 2005

432

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, SOUTER, GINSBURG, and BREYER, JJ., joined. BREYER, J., filed a concurring opinion, *post*, p. 454. THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part, in which SCALIA, J., joined, *post*, p. 455.

*David C. Frederick* argued the cause for petitioners. With him on the briefs were *Scott K. Attaway* and *Kimberly S. Keller.*

*Seth P. Waxman* argued the cause for respondent. With him on the brief were *David W. Ogden, Paul R. Q. Wolfson, Dean T. Barnhard,* and *Joseph R. Alberts.*

*Lisa S. Blatt* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Acting Solicitor General Clement, Assistant Attorney General Sansonetti, Deputy Solicitor General Hungar, Deputy Assistant Attorney General Clark, Jeffrey P. Minear, James C. Kilbourne,* and *Kenneth Von Schaumburg.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for the State of Texas et al. by *Greg Abbott,* Attorney General of Texas, *R. Ted Cruz,* Solicitor General, *Barry R. McBee,* First Assistant Attorney General, *Edward D. Burbach,* Deputy Attorney General, and *Sean D. Jordan,* Assistant Solicitor General, and by the Attorneys General for their respective States as follows: *Troy King* of Alabama, *Bill Lockyer* of California, *Richard Blu-*

JUSTICE STEVENS delivered the opinion of the Court.

Petitioners are 29 Texas peanut farmers who allege that in the 2000 growing season their crops were severely damaged by the application of respondent's newly marketed pesticide named "Strongarm." The question presented is whether the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U. S. C. § 136 *et seq.* (2000 ed. and Supp. II), pre-empts their state-law claims for damages.

## I

Pursuant to its authority under FIFRA, the Environmental Protection Agency (EPA) conditionally registered Strongarm on March 8, 2000, thereby granting respondent (Dow) permission to sell this pesticide—a weed killer[1]—in

---

*menthal* of Connecticut, *Lisa Madigan* of Illinois, *Thomas J. Miller* of Iowa, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Mike McGrath* of Montana, *Eliot Spitzer* of New York, *Jim Petro* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *Mark L. Shurtleff* of Utah, *William H. Sorrell* of Vermont, *Jerry W. Kilgore* of Virginia, and *Christine O. Gregoire* of Washington; for the Association of Trial Lawyers of America by *R. C. Westmoreland* and *Todd A. Smith;* for the Natural Resources Defense Council et al. by *Patti Goldman, Grant Cope, Brian Wolfman,* and *Leslie Brueckner;* for the Western Peanut Growers Association et al. by *Sean H. Donahue* and *David T. Goldberg;* and for Herbert Samuel Harrison by *Mikal C. Watts.*

Briefs of *amici curiae* urging affirmance were filed for the American Chemistry Council by *Richard O. Faulk;* for BASF Corp. by *Bruce Jones;* for the Chamber of Commerce of the United States by *Alan Untereiner* and *Robin S. Conrad;* for Croplife America et al. by *Lawrence S. Ebner* and *Douglas T. Nelson;* for E. I. Du Pont de Nemours and Co. et al. by *Viet D. Dinh;* for the Product Liability Advisory Council, Inc., by *Kenneth S. Geller* and *Miriam R. Nemetz;* for the Texas Chemical Council by *William Powers, Jr., David M. Gunn,* and *Russell S. Post;* for the Washington Legal Foundation by *Daniel J. Popeo;* and for Edwin L. Johnson by *David E. Menotti.*

*James L. Moore, Glen Shu, Matthew W. Caligur,* and *Patrick Lysaught* filed a brief for the Defense Research Institute as *amicus curiae.*

[1] Strongarm would more commonly be called a herbicide, but it is classified as a pesticide for purposes of FIFRA. See 7 U. S. C. §§ 136(t), (u).

the United States. Dow obtained this registration in time to market Strongarm to Texas farmers, who normally plant their peanut crops around May 1. According to petitioners—whose version of the facts we assume to be true at this stage—Dow knew, or should have known, that Strongarm would stunt the growth of peanuts in soils with pH levels of 7.0 or greater.[2] Nevertheless, Strongarm's label stated, "Use of Strongarm is recommended in all areas where peanuts are grown," App. 108, and Dow's agents made equivalent representations in their sales pitches to petitioners. When petitioners applied Strongarm on their farms—whose soils have pH levels of 7.2 or higher, as is typical in western Texas—the pesticide severely damaged their peanut crops while failing to control the growth of weeds. The farmers reported these problems to Dow, which sent its experts to inspect the crops.

Meanwhile, Dow reregistered its Strongarm label with EPA prior to the 2001 growing season. EPA approved a "supplemental" label that was for "[d]istribution and [u]se [o]nly in the states of New Mexico, Oklahoma and Texas," *id.*, at 179, the three States in which peanut farmers experienced crop damage. This new label contained the following warning: "Do not apply Strongarm to soils with a pH of 7.2 or greater." *Id.*, at 181.

After unsuccessful negotiations with Dow, petitioners gave Dow notice of their intent to bring suit as required by the Texas Deceptive Trade Practices-Consumer Protection Act[3] (hereinafter Texas DTPA). In response, Dow filed a declaratory judgment action in Federal District Court, asserting that petitioners' claims were expressly or impliedly pre-empted by FIFRA. Petitioners, in turn, brought counterclaims, including tort claims sounding in strict liability and negligence. They also alleged fraud, breach of war-

---

[2] The term "pH," which stands for pondus hydrogenii, or "potential hydrogen," refers to the acidity of the soil.

[3] Tex. Bus. & Com. Code Ann. § 17.01 *et seq.* (West 2002).

ranty, and violation of the Texas DTPA. The District Court granted Dow's motion for summary judgment, rejecting one claim on state-law grounds and dismissing the remainder as expressly pre-empted by 7 U. S. C. § 136v(b), which provides that States "shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."

The Court of Appeals affirmed. It read § 136v(b) to pre-empt any state-law claim in which "a judgment against Dow would induce it to alter its product label." 332 F. 3d 323, 331 (CA5 2003). The court held that because petitioners' fraud, warranty, and deceptive trade practices claims focused on oral statements by Dow's agents that did not differ from statements made on the product's label, success on those claims would give Dow a "strong incentive" to change its label. Those claims were thus pre-empted. Id., at 331–332. The court also found that petitioners' strict liability claim alleging defective design was essentially a "disguised" failure-to-warn claim and therefore pre-empted. Id., at 332. It reasoned: "One cannot escape the heart of the farmers' grievance: Strongarm is dangerous to peanut crops in soil with a pH level over 7.0, and that was not disclosed to them. . . . It is inescapable that success on this claim would again necessarily induce Dow to alter the Strongarm label." Id., at 332–333. The court employed similar reasoning to find the negligent testing and negligent manufacture claims pre-empted as well. Id., at 333.

This decision was consistent with those of a majority of the Courts of Appeals,[4] as well of several state high courts,[5] but conflicted with the decisions of other courts[6] and with

---

[4] See, e. g., Grenier v. Vermont Log Buildings, Inc., 96 F. 3d 559 (CA1 1996); Kuiper v. American Cyanamid Co., 131 F. 3d 656 (CA7 1997); Netland v. Hess & Clark, Inc., 284 F. 3d 895 (CA8 2002).

[5] See, e. g., Etcheverry v. Tri-Ag Serv., Inc., 22 Cal. 4th 316, 993 P. 2d 366 (2000).

[6] See, e. g., Ferebee v. Chevron Chemical Co., 736 F. 2d 1529 (CADC 1984); American Cyanamid Co. v. Geye, 79 S. W. 3d 21 (Tex. 2002).

the views of EPA set forth in an *amicus curiae* brief filed with the California Supreme Court in 2000.[7]   We granted certiorari to resolve this conflict.   542 U. S. 936 (2004).

## II

Prior to 1910 the States provided the primary and possibly the exclusive source of regulatory control over the distribution of poisonous substances.   Both the Federal Government's first effort at regulation in this area, the Insecticide Act of 1910, 36 Stat. 331, and FIFRA as originally enacted in 1947, ch. 125, 61 Stat. 163, primarily dealt with licensing and labeling.   Under the original version of FIFRA, all pesticides sold in interstate commerce had to be registered with the Secretary of Agriculture.   The Secretary would register a pesticide if it complied with the statute's labeling standards and was determined to be efficacious and safe.[8]   In 1970, EPA assumed responsibility for this registration process.

In 1972, spurred by growing environmental and safety concerns, Congress adopted the extensive amendments[9] that "transformed FIFRA from a labeling law into a comprehensive regulatory statute." *Ruckelshaus* v. *Monsanto Co.*, 467 U. S. 986, 991 (1984).   "As amended, FIFRA regulated the use, as well as the sale and labeling, of pesticides; regulated pesticides produced and sold in both intrastate and interstate commerce; provided for review, cancellation, and suspension of registration; and gave EPA greater enforcement authority." *Id.*, at 991–992.   The 1972 amendments also imposed

---

[7] See Brief for United States as *Amicus Curiae* in *Etcheverry* v. *Tri-Ag Serv., Inc.*, No. S072524 (Cal. Sup. Ct.) (hereinafter Brief *Amicus Curiae* for United States in *Etcheverry*).   The Acting Solicitor General has since adopted a contrary position.   See Brief for United States as *Amicus Curiae* 20.

[8] If the Secretary declined registration, and the manufacturer refused to make changes, the Secretary was required to register the pesticide "under protest."   In 1964, however, Congress eliminated this procedure, and required disappointed manufacturers to challenge a denial of registration through administrative review.   78 Stat. 190.

[9] Federal Environmental Pesticide Control Act of 1972, 86 Stat. 973.

a new criterion for registration—environmental safety. *Id.*, at 992. See generally 4 F. Grad, Treatise on Environmental Law §§ 8.02–8.03 (2004) (tracing FIFRA's statutory evolution).

Under FIFRA as it currently stands, a manufacturer seeking to register a pesticide must submit a proposed label to EPA as well as certain supporting data. 7 U. S. C. §§ 136a(c)(1)(C), (F). The agency will register the pesticide if it determines that the pesticide is efficacious (with the caveat discussed below), § 136a(c)(5)(A); that it will not cause unreasonable adverse effects on humans and the environment, §§ 136a(c)(5)(C), (D); § 136(bb); and that its label complies with the statute's prohibition on misbranding, § 136a(c)(5)(B); 40 CFR § 152.112(f) (2004). A pesticide is "misbranded" if its label contains a statement that is "false or misleading in any particular," including a false or misleading statement concerning the efficacy of the pesticide. 7 U. S. C. § 136(q)(1)(A); 40 CFR § 156.10(a)(5)(ii). A pesticide is also misbranded if its label does not contain adequate instructions for use, or if its label omits necessary warnings or cautionary statements. 7 U. S. C. §§ 136(q)(1)(F), (G).[10]

Because it is unlawful under the statute to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements. § 136j(a)(1)(E); see also § 136a(f)(2) (registration is prima facie evidence that the pesticide and its labeling comply with the statute's requirements, but registration does not provide a defense to the violation of the statute); § 136a(f)(1) (a manufacturer may seek approval to

---

[10] A pesticide label must also conspicuously display any statement or information specifically required by the statute or its implementing regulations. 7 U. S. C. § 136(q)(1)(E). To mention only a few examples, the label must contain the name and address of the producer, the product registration number, and an ingredient statement. 40 CFR §§ 156.10(a)(1)(ii), (iv), (vi) (2004).

amend its label). Additionally, manufacturers have a duty to report incidents involving a pesticide's toxic effects that may not be adequately reflected in its label's warnings, 40 CFR §§ 159.184(a), (b) (2004), and EPA may institute cancellation proceedings, 7 U. S. C. § 136d(b), and take other enforcement action if it determines that a registered pesticide is misbranded.[11]

Section 136v, which was added in the 1972 amendments, addresses the States' continuing role in pesticide regulation. As currently codified, § 136v provides:

"(a) In general

"A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

"(b) Uniformity

"Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

"(c) Additional uses

"(1) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the Administrator. Such registration shall be deemed registration under section 136a of this title for all purposes of this subchapter, but shall authorize distribution and use only within such State. . . ."

---

[11] EPA may issue "stop sale, use, or removal" orders and may seize offending products. 7 U. S. C. §§ 136k(a), (b). Further, manufacturers may be subjected to civil and criminal penalties for violating FIFRA's requirements. § 136l.

In 1978, Congress once again amended FIFRA, 92 Stat. 819, this time in response to EPA's concern that its evaluation of pesticide efficacy during the registration process diverted too many resources from its task of assessing the environmental and health dangers posed by pesticides. Congress addressed this problem by authorizing EPA to waive data requirements pertaining to efficacy, thus permitting the agency to register a pesticide without confirming the efficacy claims made on its label. § 136a(c)(5). In 1979, EPA invoked this grant of permission and issued a general waiver of efficacy review, with only limited qualifications not applicable here. See 44 Fed. Reg. 27932 (1979); 40 CFR § 158.640(b) (2004). In a notice published years later in 1996, EPA confirmed that it had "stopped evaluating pesticide efficacy for routine label approvals almost two decades ago," Pesticide Registration Notice 96–4, p. 3 (June 3, 1996), available at http://www.epa.gov/opppmsd1/PR_Notices/pr96-4.html, App. 232, and clarified that "EPA's approval of a pesticide label does not reflect any determination on the part of EPA that the pesticide will be efficacious or will not damage crops or cause other property damage," id., at 5, App. 235. The notice also referred to an earlier statement in which EPA observed that " 'pesticide producers are aware that they are potentially subject to damage suits by the user community if their products prove ineffective in actual use.' " Id., at 2, App. 230 (quoting 47 Fed. Reg. 40661 (col. 2) (1982)). This general waiver was in place at the time of Strongarm's registration; thus, EPA never passed on the accuracy of the statement in Strongarm's original label recommending the product's use "in all areas where peanuts are grown."

Although the modern version of FIFRA was enacted over three decades ago, this Court has never addressed whether that statute pre-empts tort and other common-law claims arising under state law. Courts entertained tort litigation against pesticide manufacturers since well before the pas-

sage of FIFRA in 1947,[12] and such litigation was a common feature of the legal landscape at the time of the 1972 amendments.[13]  Indeed, for at least a decade after those amendments, arguments that such tort suits were pre-empted by § 136v(b) either were not advanced or were unsuccessful. See, e. g., *Ferebee* v. *Chevron Chemical Co.*, 736 F. 2d 1529 (CADC 1984).  It was only after 1992 when we held in *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, that the term "requirement or prohibition" in the Public Health Cigarette Smoking Act of 1969 included common-law duties, and therefore pre-empted certain tort claims against cigarette companies, that a groundswell of federal and state decisions emerged holding that § 136v(b) pre-empted claims like those advanced in this litigation.

This Court has addressed FIFRA pre-emption in a different context.  In *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597 (1991), we considered a claim that § 136v(b) pre-empted a small town's ordinance requiring a special permit for the aerial application of pesticides.  Although the ordinance imposed restrictions not required by FIFRA or any EPA regulation, we unanimously rejected the pre-emption claim.  In our opinion we noted that FIFRA was not "a sufficiently comprehensive statute to justify an inference that Congress had occupied the field to the exclusion of the

---

[12] See, e. g., *Mossrud* v. *Lee*, 163 Wis. 229, 157 N. W. 758 (1916); *West Disinfecting Co.* v. *Plummer*, 44 App. D. C. 345 (1916); *McCrossin* v. *Noyes Bros. & Cutler, Inc.*, 143 Minn. 181, 173 N. W. 566 (1919); *White* v. *National Bank of Commerce*, 99 Cal. App. 519, 278 P. 915 (1929).

[13] See Hursh, Annotation, Liability of Manufacturer or Seller for Injury Caused by Animal Feed or Medicines, Crop Sprays, Fertilizers, Insecticides, Rodenticides, and Similar Products, 81 A. L. R. 2d 138, 144 (1962) ("A duty of due, reasonable care binds manufacturers and sellers of products of this kind.  This duty of care includes a duty to warn of product-connected dangers, a duty on the part of the manufacturer to subject the product to reasonable tests, and a duty on the part of the seller to subject the product to reasonable inspection" (footnotes omitted)) (collecting cases).

States." *Id.*, at 607. "To the contrary, the statute leaves ample room for States and localities to supplement federal efforts even absent the express regulatory authorization of § 136v(a)." *Id.*, at 613.

As a part of their supplementary role, States have ample authority to review pesticide labels to ensure that they comply with both federal and state labeling requirements.[14] Nothing in the text of FIFRA would prevent a State from making the violation of a federal labeling or packaging requirement a state offense, thereby imposing its own sanctions on pesticide manufacturers who violate federal law. The imposition of state sanctions for violating state rules that merely duplicate federal requirements is equally consistent with the text of § 136v.

## III

Against this background, we consider whether petitioners' claims[15] are pre-empted by § 136v(b), which, again, reads as

[14] As EPA's Website explains, "Federal law requires that before selling or distributing a pesticide in the United States, a person or company must obtain registration, or license, from EPA. . . . Most states conduct a review of the pesticide label to ensure that it complies with federal labeling requirements and any additional state restrictions of use." EPA, Pesticides: Regulating Pesticides, Evaluating Potential New Pesticides and Uses, http://www.epa.gov/pesticides/regulating/index.htm (as visited Apr. 6, 2005, and available in Clerk of Court's case file). See also 4 F. Grad, Treatise on Environmental Law § 8.05, p. 8–140 (2004) ("All the state[s] have some labeling requirements for pesticides, and these generally parallel [FIFRA] of 1947"); *id.*, at 8–143 to 8–218 (reviewing the pesticide statutes of the 50 States).

[15] The briefing and the record leave some confusion as to what precise claims are at issue. In light of the posture of this case, we find it appropriate to address the following claims: breach of express warranty, fraud, violation of the Texas DTPA, strict liability (including defective design and defective manufacture), and negligent testing. We will also address negligent failure to warn, since the Court of Appeals read petitioners' allegations to support such a claim. But because petitioners do not press such a claim here, we leave it to the court below to determine whether they may proceed on such a claim on remand. Of course, we express no

follows: "Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter."

The introductory words of § 136v(b)—"Such State"—appear to limit the coverage of that subsection to the States that are described in the preceding subsection (a). Texas is such a State because it regulates the sale and use of federally registered pesticides and does not permit any sales or uses prohibited by FIFRA. It is therefore beyond dispute that subsection (b) is applicable to this case.

The prohibitions in § 136v(b) apply only to "requirements." An occurrence that merely motivates an optional decision does not qualify as a requirement. The Court of Appeals was therefore quite wrong when it assumed that any event, such as a jury verdict, that might "induce" a pesticide manufacturer to change its label should be viewed as a requirement. The Court of Appeals did, however, correctly hold that the term "requirements" in § 136v(b) reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties. Our decision in *Cipollone* supports this conclusion. See 505 U. S., at 521 (plurality opinion) ("The phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules"); see also *id.*, at 548–549 (SCALIA, J., concurring in judgment in part and dissenting in part). While the use of "requirements" in a pre-emption clause may not invariably carry this meaning, we think this is the best reading of § 136v(b).

That § 136v(b) may pre-empt judge-made rules, as well as statutes and regulations, says nothing about the *scope* of that

view as to whether any of these claims are viable as a matter of Texas law. Nor do we, given the early stage of this litigation, opine on whether petitioners can adduce sufficient evidence in support of their claims to survive summary judgment.

pre-emption. For a particular state rule to be pre-empted, it must satisfy two conditions. First, it must be a requirement *"for labeling or packaging"*; rules governing the design of a product, for example, are not pre-empted. Second, it must impose a labeling or packaging requirement that is *"in addition to or different from* those required under this subchapter." A state regulation requiring the word "poison" to appear in red letters, for instance, would not be pre-empted if an EPA regulation imposed the same requirement.

It is perfectly clear that many of the common-law rules upon which petitioners rely do not satisfy the first condition. Rules that require manufacturers to design reasonably safe products, to use due care in conducting appropriate testing of their products, to market products free of manufacturing defects, and to honor their express warranties or other contractual commitments plainly do not qualify as requirements for "labeling or packaging." None of these common-law rules requires that manufacturers label or package their products in any particular way. Thus, petitioners' claims for defective design, defective manufacture, negligent testing, and breach of express warranty are not pre-empted.

To be sure, Dow's express warranty was located on Strongarm's label.[16] But a cause of action on an express warranty asks only that a manufacturer make good on the contractual commitment that it voluntarily undertook by placing that warranty on its product.[17] Because this

---

[16] The label stated: "Dow AgroSciences warrants that this product conforms to the chemical description on the label and is reasonably fit for the purposes stated on the label when used in strict accordance with the directions, subject to the inherent risks set forth below." App. 111.

[17] To the extent that petitioners' warranty and fraud claims are based on oral representations made by Dow's agents, they fall outside the text of § 136v(b) for an independent reason. Because FIFRA defines labeling as "all labels and all other written, printed, or graphic matter" that accompany a pesticide, § 136(p)(2), any requirement that applied to a sales agent's *oral* representations would not be a requirement for "labeling or packaging."

common-law rule does not require the manufacturer to make an express warranty, or in the event that the manufacturer elects to do so, to say anything in particular in that warranty, the rule does not impose a requirement "for labeling or packaging." See *id.*, at 525–526 (plurality opinion).[18]

In arriving at a different conclusion, the court below reasoned that a finding of liability on these claims would "induce Dow to alter [its] label." 332 F. 3d, at 332.[19] This effects-based test finds no support in the text of § 136v(b), which speaks only of "requirements." A requirement is a rule of law that must be obeyed; an event, such as a jury verdict, that merely motivates an optional decision is not a requirement. The proper inquiry calls for an examination of the elements of the common-law duty at issue, see *Cipollone*, 505 U. S., at 524 (plurality opinion); it does not call for speculation as to whether a jury verdict will prompt the manufacturer to take any particular action (a question, in any event, that will depend on a variety of cost/benefit calculations best left to the manufacturer's accountants).

The inducement test is unquestionably overbroad because it would impeach many "genuine" design defect claims that Dow concedes are not pre-empted. A design defect claim, if successful, would surely induce a manufacturer to alter its label to reflect a change in the list of ingredients or a change in the instructions for use necessitated by the improvement

---

[18] The Court of Appeals held that petitioners' claim under the Texas DTPA was pre-empted insofar as the Act provides a remedy for the breach of an express warranty. 332 F. 3d 323, 332 (CA5 2003) (citing Texas law). Because petitioners' warranty claim is not pre-empted, their claim under the Act is not pre-empted to that extent.

[19] Other Courts of Appeals have taken a similar approach. See, *e. g.*, *Netland*, 284 F. 3d, at 900 ("Thus, our task is to determine whether Netland's claims are essentially a challenge to Bovinol's label or the overall design of the pesticide. To guide our analysis, we must ask whether in seeking to avoid liability for any error, would the manufacturer choose to alter the label or the product").

in the product's design. Moreover, the inducement test is not entirely consistent with § 136v(a), which confirms the State's broad authority to regulate the sale and use of pesticides.[20] Under § 136v(a), a state agency may ban the sale of a pesticide if it finds, for instance, that one of the pesticide's label-approved uses is unsafe. This ban might well induce the manufacturer to change its label to warn against this questioned use. Under the inducement test, however, such a restriction would anomalously qualify as a "labeling" requirement. It is highly unlikely that Congress endeavored to draw a line between the type of indirect pressure caused by a State's power to impose sales and use restrictions and the even more attenuated pressure exerted by common-law suits. The inducement test is not supported by either the text or the structure of the statute.

Unlike their other claims, petitioners' fraud and negligent-failure-to-warn claims are premised on common-law rules that qualify as "requirements for labeling or packaging." These rules set a standard for a product's labeling that the Strongarm label is alleged to have violated by containing false statements and inadequate warnings. While the courts of appeals have rightly found guidance in *Cipollone*'s interpretation of "requirements," some of those courts too quickly concluded that failure-to-warn claims were preempted under FIFRA, as they were in *Cipollone*, without paying attention to the rather obvious textual differences between the two pre-emption clauses.[21]

---

[20] In *Wisconsin Public Intervenor* v. *Mortier*, 501 U. S. 597 (1991), we noted that § 136v(a) is merely declaratory of the authority that the States retained after FIFRA; that provision did not "serve to hand back to the States powers that the statute had impliedly usurped." *Id.*, at 614.

[21] See, *e. g.*, *Taylor AG Industries* v. *Pure-Gro*, 54 F. 3d 555, 559 (CA9 1995) ("There is no notable difference between the language in the 1969 Cigarette Act and the language in FIFRA"); *Shaw* v. *Dow Brands, Inc.*, 994 F. 2d 364, 371 (CA7 1993) ("Not even the most dedicated hair-splitter could distinguish these statements").

Unlike the pre-emption clause at issue in *Cipollone*,[22] § 136v(b) prohibits only state-law labeling and packaging requirements that are *"in addition to or different from"* the labeling and packaging requirements under FIFRA. Thus, a state-law labeling requirement is not pre-empted by § 136v(b) if it is equivalent to, and fully consistent with, FIFRA's misbranding provisions. Petitioners argue that their claims based on fraud and failure to warn are not pre-empted because these common-law duties are equivalent to FIFRA's requirements. that a pesticide label not contain "false or misleading" statements, § 136(q)(1)(A), or inadequate instructions or warnings. §§ 136(q)(1)(F), (G). We agree with petitioners insofar as we hold that state law need not explicitly incorporate FIFRA's standards as an element of a cause of action in order to survive pre-emption. As we will discuss below, however, we leave it to the Court of Appeals to decide in the first instance whether these particular common-law duties are equivalent to FIFRA's misbranding standards.

The "parallel requirements" reading of § 136v(b) that we adopt today finds strong support in *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470 (1996). In addressing a similarly worded pre-emption provision in a statute regulating medical devices, we found that "[n]othing in [21 U. S. C.] § 360k denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements." *Id.*, at 495.[23] As JUSTICE O'CONNOR

---

[22] "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this [Act]." 15 U. S. C. § 1334(b); *Cipollone*, 505 U. S., at 515.

[23] We added: "Even if it may be necessary as a matter of Florida law to prove that those violations were the result of negligent conduct, or that they created an unreasonable hazard for users of the product, such additional elements of the state-law cause of action would make the state requirements narrower, not broader, than the federal requirement. While

explained in her separate opinion, a state cause of action that seeks to enforce a federal requirement "does not impose a requirement that is 'different from, or in addition to,' requirements under federal law. To be sure, the threat of a damages remedy will give manufacturers an additional cause to comply, but the requirements imposed on them under state and federal law do not differ. Section 360k does not preclude States from imposing different or additional *remedies*, but only different or additional *requirements*." *Id.*, at 513 (opinion concurring in part and dissenting in part). Accordingly, although FIFRA does not provide a federal remedy to farmers and others who are injured as a result of a manufacturer's violation of FIFRA's labeling requirements, nothing in § 136v(b) precludes States from providing such a remedy.

Dow, joined by the United States as *amicus curiae*, argues that the "parallel requirements" reading of § 136v(b) would "give juries in 50 States the authority to give content to FIFRA's misbranding prohibition, establishing a crazy-quilt of anti-misbranding requirements different from the one defined by FIFRA itself and intended by Congress to be interpreted authoritatively by EPA." Brief for Respondent 16; see also Brief for United States as *Amicus Curiae* 25–27. In our view, however, the clear text of § 136v(b) and the authority of *Medtronic* cannot be so easily avoided. Conspicuously absent from the submissions by Dow and the United States is any plausible alternative interpretation of "in addition to or different from" that would give that phrase meaning. Instead, they appear to favor reading those words out of the statute, which would leave the following: "Such State shall not impose or continue in effect any requirements for

such a narrower requirement might be 'different from' the federal rules in a literal sense, such a difference would surely provide a strange reason for finding pre-emption of a state rule insofar as it duplicates the federal rule." 518 U. S., at 495.

labeling or packaging." This amputated version of § 136v(b) would no doubt have clearly and succinctly commanded the pre-emption of *all* state requirements concerning labeling. That Congress added the remainder of the provision is evidence of its intent to draw a distinction between state labeling requirements that are pre-empted and those that are not.

Even if Dow had offered us a plausible alternative reading of § 136v(b)—indeed, even if its alternative were just as plausible as our reading of that text—we would nevertheless have a duty to accept the reading that disfavors pre-emption. "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Medtronic*, 518 U. S., at 485. In areas of traditional state regulation, we assume that a federal statute has not supplanted state law unless Congress has made such an intention "'clear and manifest.'" *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)); see also *Medtronic*, 518 U. S., at 485. Our reading is at once the only one that makes sense of each phrase in § 136v(b) and the one favored by our canons of interpretation. The notion that FIFRA contains a nonambiguous command to pre-empt the types of tort claims that parallel FIFRA's misbranding requirements is particularly dubious given that just five years ago the United States advocated the interpretation that we adopt today.[24]

The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption. If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly. See

---

[24] Brief *Amicus Curiae* for United States in *Etcheverry* 33–35. See also Brief for United States as *Amicus Curiae* 20 (explaining its subsequent change in view).

*Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 251 (1984).[25] Moreover, this history emphasizes the importance of providing an incentive to manufacturers to use the utmost care in the business of distributing inherently dangerous items. See *Mortier*, 501 U. S., at 613 (stating that the 1972 amendments' goal was to "strengthen existing labeling requirements and ensure that these requirements were followed in practice"). Particularly given that Congress amended FIFRA to allow EPA to waive efficacy review of newly registered pesticides (and in the course of those amendments made technical changes to § 136v(b)), it seems unlikely that Congress considered a relatively obscure provision like § 136v(b) to give pesticide manufacturers virtual immunity from certain forms of tort liability. Overenforcement of FIFRA's misbranding prohibition creates a risk of imposing unnecessary financial burdens on manufacturers; underenforcement creates not only financial risks for consumers, but risks that affect their safety and the environment as well.

Finally, we find the policy objections raised against our reading of § 136v(b) to be unpersuasive. Dow and the United States greatly overstate the degree of uniformity and centralization that characterizes FIFRA. In fact, the statute authorizes a relatively decentralized scheme that preserves a broad role for state regulation. See *ibid.* Most significantly, States may ban or restrict the uses of pesticides that EPA has approved, § 136v(a); they may also register, subject to certain restrictions, pesticides for uses beyond those approved by EPA, § 136v(c). See also § 136w–1 (authorizing EPA to grant States primary enforcement responsibility for use violations). A literal reading of § 136v(b)

---

[25] It is no answer that, even if all label-related claims are pre-empted under Dow's reading, other non-label-related tort claims would remain intact. Given the inherently dangerous nature of pesticides, most safety gains are achieved not through modifying a pesticide's design, but by improving the warnings and instructions contained on its label. See Brief for American Chemistry Council as *Amicus Curiae* 3.

is fully consistent with the concurrent authority of the Federal and State Governments in this sphere.

Private remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of FIFRA. Unlike the cigarette labeling law at issue in *Cipollone,* which prescribed certain immutable warning statements, FIFRA contemplates that pesticide labels will evolve over time, as manufacturers gain more information about their products' performance in diverse settings. As one court explained, tort suits can serve as a catalyst in this process:

> "By encouraging plaintiffs to bring suit for injuries not previously recognized as traceable to pesticides such as [the pesticide there at issue], a state tort action of the kind under review may aid in the exposure of new dangers associated with pesticides. Successful actions of this sort may lead manufacturers to petition EPA to allow more detailed labelling of their products; alternatively, EPA itself may decide that revised labels are required in light of the new information that has been brought to its attention through common law suits. In addition, the specter of damage actions may provide manufacturers with added dynamic incentives to continue to keep abreast of all possible injuries stemming from use of their product so as to forestall such actions through product improvement." *Ferebee,* 736 F. 2d, at 1541–1542.

Dow and the United States exaggerate the disruptive effects of using common-law suits to enforce the prohibition on misbranding. FIFRA has prohibited inaccurate representations and inadequate warnings since its enactment in 1947, while tort suits alleging failure-to-warn claims were common well before that date and continued beyond the 1972 amendments. We have been pointed to no evidence that such tort suits led to a "crazy-quilt" of FIFRA standards or otherwise

created any real hardship for manufacturers or for EPA. Indeed, for much of this period EPA appears to have welcomed these tort suits. While it is true that properly instructed juries might on occasion reach contrary conclusions on a similar issue of misbranding, there is no reason to think such occurrences would be frequent or that they would result in difficulties beyond those regularly experienced by manufacturers of other products that every day bear the risk of conflicting jury verdicts. Moreover, it bears noting that lay juries are in no sense anathema to FIFRA's scheme: In criminal prosecutions for violation of FIFRA's provisions, see § 136*l*(b), juries necessarily pass on allegations of misbranding.

In sum, under our interpretation, § 136v(b) retains a narrow, but still important, role. In the main, it pre-empts competing state labeling standards—imagine 50 different labeling regimes prescribing the color, font size, and wording of warnings—that would create significant inefficiencies for manufacturers.[26] The provision also pre-empts any statutory or common-law rule that would impose a labeling requirement that diverges from those set out in FIFRA and its implementing regulations. It does not, however, pre-empt any state rules that are fully consistent with federal requirements.

---

[26] The legislative history of the 1972 amendments suggests that Congress had conflicting state labeling regulations in mind when crafting § 136v(b). As one industry representative testified: "Some States might want the word 'flammable,' some 'inflammable.' . . . Some States might want red lettering; others orange, another yellow, and so forth. We ask this committee, therefore, to recognize, as the Congress has in a number of similar regulatory statutes, the industry's need for uniformity by providing for this in the act." Hearings on Federal Pesticide Control Act of 1971 before the House Committee on Agriculture, 92d Cong., 1st Sess., 281–283 (1971) (statement of Robert L. Ackerly). By contrast, the lengthy legislative history is barren of any indication that Congress meant to abrogate most of the common-law duties long owed by pesticide manufacturers.

Having settled on our interpretation of § 136v(b), it still remains to be decided whether that provision pre-empts petitioners' fraud and failure-to-warn claims. Because we have not received sufficient briefing on this issue,[27] which involves questions of Texas law, we remand it to the Court of Appeals. We emphasize that a state-law labeling requirement must in fact be equivalent to a requirement under FIFRA in order to survive pre-emption. For example, were the Court of Appeals to determine that the element of falsity in Texas' common-law definition of fraud imposed a broader obligation than FIFRA's requirement that labels not contain "false or misleading statements," that state-law cause of action would be pre-empted by § 136v(b) to the extent of that difference. State-law requirements must also be measured against any relevant EPA regulations that give content to FIFRA's misbranding standards. For example, a failure-to-warn claim alleging that a given pesticide's label should have stated "DANGER" instead of the more subdued "CAUTION" would be pre-empted because it is inconsistent with 40 CFR § 156.64 (2004), which specifically assigns these warnings to particular classes of pesticides based on their toxicity.[28]

---

[27] Dow does not seem to argue that, by their terms, Texas' fraud and failure-to-warn causes of action are not equivalent to FIFRA's misbranding standards. Nor has Dow identified any EPA regulations that further refine those general standards in any way that is relevant to petitioners' allegations. Rather, Dow has chosen to mount a broader attack on the "parallel requirements" interpretation, thus seeming to argue for the pre-emption of even a state-law cause of action that *expressly* incorporates FIFRA's misbranding provisions. See Brief for Respondent 38, n. 25. Since Dow did not have the benefit of our construction of § 136v(b), Dow should be allowed to address these matters on remand.

[28] At present, there appear to be relatively few regulations that refine or elaborate upon FIFRA's broadly phrased misbranding standards. To the extent that EPA promulgates such regulations in the future, they will necessarily affect the scope of pre-emption under § 136v(b).

In undertaking a pre-emption analysis at the pleadings stage of a case, a court should bear in mind the concept of equivalence. To survive pre-emption, the state-law requirement need not be phrased in the *identical* language as its corresponding FIFRA requirement; indeed, it would be surprising if a common-law requirement used the same phraseology as FIFRA. If a case proceeds to trial, the court's jury instructions must ensure that nominally equivalent labeling requirements are *genuinely* equivalent. If a defendant so requests, a court should instruct the jury on the relevant FIFRA misbranding standards, as well as any regulations that add content to those standards. For a manufacturer should not be held liable under a state labeling requirement subject to § 136v(b) unless the manufacturer is also liable for misbranding as defined by FIFRA.

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, concurring.

I write separately to stress the practical importance of the Court's statement that state-law requirements must "be measured against" relevant Environmental Protection Agency (EPA) regulations "that give content to [the Federal Insecticide, Fungicide, and Rodenticide Act's (FIFRA)] misbranding standards." *Ante*, at 453. In *Medtronic, Inc.* v. *Lohr*, 518 U. S. 470 (1996), I pointed out that an administrative agency, there the Food and Drug Administration, had the legal authority within ordinary administrative constraints to promulgate agency rules and to determine the pre-emptive effect of those rules in light of the agency's special understanding of "whether (or the extent to which) state requirements may interfere with federal objectives." *Id.*, at 506 (opinion concurring in part and concurring in judgment). The EPA enjoys similar authority here. See 7 U. S. C.

§ 136w(a)(1). As suggested by *Medtronic*, the federal agency charged with administering the statute is often better able than are courts to determine the extent to which state liability rules mirror or distort federal requirements. Thus, the EPA may prove better able than are courts to determine whether general state tort liability rules simply help to expose " 'new dangers associated with pesticides,' " *ante*, at 451 (quoting *Ferebee* v. *Chevron Chemical Co.*, 736 F. 2d 1529, 1541 (CADC 1984)), or instead bring about a counterproductive " 'crazy-quilt of anti-misbranding requirements,' " *ante*, at 448 (quoting Brief for Respondent 16). And, within appropriate legal and administrative constraints, it can act accordingly. Cf. *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U. S. 707, 721 (1985) (agencies can monitor the dynamic between federal and local requirements and promulgate regulations pre-empting local legislation that interferes with federal goals). Emphasizing the importance of the agency's role in overseeing FIFRA's future implementation, I join the Court's opinion.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in the judgment in part and dissenting in part.

I agree with the Court that the term "requirements" in § 24(b) of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U. S. C. § 136v(b), includes common-law duties for labeling or packaging. *Ante*, at 443. I also agree that state-law damages claims may not impose requirements "in addition to or different from" FIFRA's. *Ante*, at 452–454. While States are free to impose liability predicated on a violation of the federal standards set forth in FIFRA and in any accompanying regulations promulgated by the Environmental Protection Agency, they may not impose liability for labeling requirements predicated on distinct state standards of care. Section 136v(b) permits States to add remedies—not to alter or augment the substantive rules governing liability for labeling. See *Medtronic, Inc.* v. *Lohr*, 518

U. S. 470, 513 (1996) (O'CONNOR, J., concurring in part and dissenting in part). Because the parties have not argued that Dow violated FIFRA's labeling standards,* the majority properly remands for the District Court to consider whether Texas law mirrors the federal standards.

However, the majority omits a step in its reasoning that should be made explicit: A state-law cause of action, even if not specific to labeling, nevertheless imposes a labeling requirement "in addition to or different from" FIFRA's when it attaches liability to statements on the label that do not produce liability under FIFRA. The state-law cause of action then adds some supplemental requirement of truthfulness to FIFRA's requirement that labeling statements not be "false or misleading." 7 U. S. C. § 136(q)(1)(A). That is why the fraud claims here are properly remanded to determine whether the state and federal standards for liability-incurring statements are, in their application to this case, the same. See *ante*, at 453–454.

Under that reasoning, the majority mistreats two sets of petitioners' claims. First, petitioners' breach-of-warranty claims should be remanded for pre-emption analysis, contrary to the majority's disposition, see *ante*, at 444–445. To the extent that Texas' law of warranty imposes liability for statements on the label where FIFRA would not, Texas' law is pre-empted. See *Cipollone* v. *Liggett Group, Inc.*, 505 U. S. 504, 551 (1992) (SCALIA, J., concurring in judgment in part and dissenting in part). Second, the majority holds that petitioners' claim under the Texas Deceptive Trade Practices-Consumer Protection Act (DTPA) is not pre-empted to the extent it is a breach-of-warranty claim. *Ante*, at 445, n. 18. However, the DTPA claim is also (and, in fact, perhaps exclusively) a claim for false or misleading representations on the label. App. 185–186. Therefore, all aspects of the DTPA claim should be remanded. The DTPA claim,

---

*Petitioners' counterclaim expressly disclaims that Dow violated any provision of FIFRA. App. 192 (First Amended Counterclaim).

like petitioners' fraud claims, should be pre-empted insofar as it imposes liability for label content where FIFRA would not.

I also note that, despite the majority's reference to a failure-to-warn claim, *ante,* at 442–443, n. 15, petitioners have not advanced an actual failure-to-warn claim. Instead, the Court of Appeals treated petitioners' claims for negligent testing and defective design and manufacture as "disguised claim[s] for failure to warn." 332 F. 3d 323, 332–333 (CA5 2003). If petitioners offer no evidence on remand that Dow erred in the testing, design, or manufacture of Strongarm, these claims will fail on the merits. On that point, I take the majority to agree. *Ante,* at 442–443, n. 15.

We need go no further to resolve this case. The ordinary meaning of § 136v(b)'s terms makes plain that some of petitioners' state-law causes of action may be pre-empted. Yet the majority advances several arguments designed to tip the scales in favor of the States and against the Federal Government. These arguments, in addition to being unnecessary, are unpersuasive. For instance, the majority states that the presumption against pre-emption requires choosing the interpretation of § 136v(b) that disfavors pre-emption. *Ante,* at 449. That presumption does not apply, however, when Congress has included within a statute an express pre-emption provision. See *Cipollone* v. *Liggett Group, Inc., supra,* at 545–546 (SCALIA, J., concurring in judgment in part and dissenting in part); Nelson, Preemption, 86 Va. L. Rev. 225, 291–292, 298–303 (2000). Section 136v(b) is an explicit statement that FIFRA pre-empts some state-law claims. Thus, our task is to determine which state-law claims § 136v(b) pre-empts, without slanting the inquiry in favor of either the Federal Government or the States.

The history of tort litigation against manufacturers is also irrelevant. *Ante,* at 449–450. We cannot know, without looking to the text of § 136v(b), whether FIFRA preserved that tradition or displaced it. The majority notes that Con-

gress must have intended to preserve common-law suits, because the legislative history does not indicate that Congress meant to abrogate such suits. *Ante,* at 452, n. 26; see also *Small* v. *United States, ante,* at 406 (THOMAS, J., dissenting) (criticizing novel practice of relying on silence in the legislative history); *Koons Buick Pontiac GMC, Inc.* v. *Nigh,* 543 U. S. 50, 73–74 (2004) (SCALIA, J., dissenting) (same). For the Court, then, enacting a pre-emption provision is not enough: Either Congress must speak with added specificity in the statute (to avoid the presumption against pre-emption) or some individual Members of Congress or congressional committees must display their preference for pre-emption in the legislative record (to avoid a new canon of congressional silence). But the Court does not believe its own test, for it agrees that § 136v(b) stands to abrogate many common-law causes of action. On remand, for example, petitioners may be unable to pursue a traditional common-law suit under Texas' law of fraud. Finally, while allowing additional state-law remedies likely aids in enforcing FIFRA's misbranding requirements, *ante,* at 451, it is for Congress, not this Court, to strike a balance between state tort suits and federal regulation.

Because we need only determine the ordinary meaning of § 136v(b), the majority rightly declines to address respondent's argument that petitioners' claims are subject to other types of pre-emption. Brief for Respondent 36–37. For instance, the majority does not ask whether FIFRA's regulatory scheme is "so pervasive," and the federal interest in labeling "so dominant," that there is no room for States to provide additional remedies. *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218, 230 (1947). Nor does the majority ask whether enforcement of state-law labeling claims would "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting FIFRA. *Hines* v. *Davidowitz,* 312 U. S. 52, 67 (1941).

Today's decision thus comports with this Court's increasing reluctance to expand federal statutes beyond their terms through doctrines of implied pre-emption. See *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison,* 520 U. S. 564, 617 (1997) (THOMAS, J., dissenting). This reluctance reflects that pre-emption analysis is not "[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Gade* v. *National Solid Wastes Management Assn.,* 505 U. S. 88, 111 (1992) (KENNEDY, J., concurring in part and concurring in judgment), but an inquiry into whether the ordinary meanings of state and federal law conflict.