POOLER, Circuit Judge,
concurring in part and dissenting in part.
The majority today holds that when a device has gone through the PMA process, all state tort claims regarding the design or labeling of that device are preempted. While the majority opinion skillfully negotiates a complex and splintered area of the law, I believe it overlooks two critical aspects of the preemption analysis: the presumption against preemption and congressional intent. Because both these factors weigh against a finding of preemption, I would resolve the close question of wheth *128 er the PMA process constitutes a device-specific federal requirement in the negative and find that the Riegel’s tort claims are not preempted. Therefore, I respectfully dissent.
I.
The Supreme Court has instructed that “[although our analysis of the scope of the preemption statute must begin with its text, ... that interpretation is informed by two presumptions about the nature of preemption.” Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (citing Gade v. Nat’l Solid Wastes Mgmt. Ass’n., 505 U.S. 88, 111, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring)). First, we begin with “the presumption that state or local regulation of matters related to health or safety is not invalidated” by preemption. Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 715, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985). Second, “ ‘[t]he purpose of Congress is the ultimate touchstone’ of preemption analysis.” Ci-pllone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992) (quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)).
Out of respect for the fact that “the States are independent sovereigns in our federal system,” we assume that “the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.” Lohr, 518 U.S. at 485, 116 S.Ct. 2240. Thus, where the states have a long tradition of providing a tort remedy to protect their citizens, the presumption against preemption is particularly strong. See Bates v. Dow Agrosciences LLC, 544 U.S. 431, 125 S.Ct. 1788, 1801 (2005) (“The long history of tort litigation against manufacturers of poisonous substances adds force to the basic presumption against pre-emption.”). “States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.” Lohr, 518 U.S. at 475, 116 S.Ct. 2240. In particular, states have generally provided tort remedies to their citizens when they are injured by defective products.
As the majority notes, Congress enacted the MDA “to provide for the safety and effectiveness of medical devices intended for human use.” 90 Stat. 539. One major impetus for the legislation was problems with the Daikon Shield, an intrauterine contraceptive device that resulted in a high percentage of inadvertent pregnancies, serious infections, and even some deaths. Lohr, 518 U.S. at 476, 116 S.Ct. 2240; see also H.R.Rep. No. 94-853, at 8 (1976). Concern about better protecting the public from unsafe devices runs throughout the legislative history of the MDA. See, e.g., H.R.Rep. No. 94-853, at 10 (“[PJresent and potential hazards, and the need for reliability and effectiveness of devices necessitates explicit legislation.” (quoting the Report of the Cooper Committee, convened in 1969 to study medical devices)). Senator Edward Kennedy, a major proponent of the MDA, noted that “[t]he legislation is written so that the benefit of the doubt is always given to the consumer. After all it is the consumer who pays with his health and his life for medical device malfunctions.” 94 Cong. Rec. 10688. Thus, although legislators may have had a secondary concern about stifling innovation through over regulation, see H.R.Rep. No. 94-853, at 12, their primary purpose was clearly to protect consumers from unsafe medical devices.
The legislative history of the MDA provides no indication that Congress considered the preemption of state tort liability *129 or even that Congress had any concern about litigation hampering the development of useful medical devices. See Lohr, 518 U.S. at 490-91, 116 S.Ct. 2240 (plurality opinion). Similarly, contemporaneous analyses of the MDA are silent on the possibility of preemption of state tort claims. Id. at 491 n. 13, 116 S.Ct. 2240. If Congress actually intended to preempt all state tort claims for defective devices, it seems unlikely that such a dramatic change from existing law would go entirely unmentioned, particularly considering the well-known, ongoing, litigation over such devices as the Daikon Shield. Id. at 491, 116 S.Ct. 2240. The only discussion of the preemption provision that I have found indicates that it was primarily focused on preventing state regulatory schemes, which some states had adopted in the absence of federal regulation on the topic. H.R.Rep. No. 94-853, at 45-46. State tort remedies are not mentioned. Id.
“This silence takes on added significance in light of Congress' failure to provide any federal remedy for persons injured by such conduct.” Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). It is hard to believe 'that Congress, while enacting the FDA to protect consumers, intended to preempt all state tort claims, when that result will have such negative consequences for those same consumers. Because the MDA does not provide a federal remedy for injured consumérs, the decision today will deprive those who were injured by an unreasonably dangerous medical device of any remedy whatsoever.’ If the FDA or the manufacturer negligently fails to consider a potential danger posed by a medical device, it is the injured consumer alone who will pay the price. Worse still, because the Supreme Court has found that fraud on the FDA claims are impliedly preempted, see Buckman v. Plaintiffs’ Legal Comm., 531 U.S. 341, 348, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001), even if PMA was obtained through intentional misrepresentation on the part of the manufacturer, by, for example, failing to report studies indicating substantial risks, the injured consumer cannot recover any compensation for her injury. “If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly.” Bates, 125 S.Ct. at 1801 (citing Silkwood, 464 U.S. at 251, 104 S.Ct. 615).
Furthermore, the idea that all state tort claims are unambiguously preempted is “particularly dubious” considering it appears that until relatively recently neither the industry nor the FDA thought such claims were preempted. See Bates, 125 S.Ct. at 1801. It was over fifteen years after the MDA was enacted before the industry began to assert preemption based on FDA approval as a defense to state tort suits. See Goodlin v. Medtronic, Inc., 167 F.3d 1367, 1381 (11th Cir.1999) (noting that Slater v. Optical Radiation Corp., 756 F.Supp. 370 (N.D.Ill.1991), aff'd, 961 F.2d 1330 (7th Cir.1992), was one of the earliest cases in which this argument was raised). As recently as 1997, the FDA took the position that common law duties would be preempted only when the FDA has expressly imposed through regulation or order a specific substantive requirement applicable to a particular medical device and the state common law would impose a different ’ or additional requirement on the same device.[19]. See Proposed Rule: Medical Devices; Preemption of State Product *130 Liability Claims, 62 Fed.Reg. 65384, 65387 (Dec. 12, 1997); Brief for United States as Amicus Curiae Opposing Writ of Certiorari at 19, Smiths Indus. Med. Sys., Inc. v. Kernats, 520 U.S. 1208, 117 S.Ct. 1690, 137 L.Ed.2d 817 (1997).
Traditionally, state tort claims for negligent design or labeling have provided compensation to consumers when the manufacturer knew or should have known that the design of its product posed an unreasonable risk of harm, and the manufacturer fails to improve the design or warn the consumer about the risk. In addition, strict product liability has generally placed the burden of.compensating injured users on manufacturers because they are in a better position to insure against the risk and spread that cost among those who benefit from the product. See Ashley W. Warren, Preemption of Claims Related to Class III Medical Devices: Are the Federal Objectives of Public Health and Safety Furthered or Hindered?, 49 SMU L.Rev. 619, 643 (1996). The finding of preemption here will place that risk entirely on those unfortunate enough to be injured by defective devices. And if manufacturers are not forced to internalize the costs of risks associated with their devices, they will have little incentive to continue to improve the safety of their products once PMA is granted. See Roger W. Bivens, Substantially Equivalent? Federal Preemption of State Commovr-Law Claims Involving Medical Devices, 74 Tex. L.Rev. 1087, 1120 (1996). This will undoubtedly reduce the resources expended on safety related innovations that would benefit consumers.
These problems might not in reality undermine Congress’s intent to protect consumers if the FDA could generally be trusted to do an adequate job of ensuring the safety of medical devices, but there are serious reasons to doubt that this is the case. Even if the influence of the regulated industry over the agency does not undermine the FDA’s effectiveness, the FDA may not have adequate resources to genuinely ensure that devices are safe or to properly and efficiently reevaluate approvals as new information becomes available.[20] See Catherine T. Struve, The FDA and the Tort System: Postmarketing Surveillance, Compensation, and the Role of Litigation, 5 Yale J. Health Pl’y L. & Ethics 587, 601-07 (2005).
Despite the majority’s emphasis on the large number of hours spent reviewing each PMA application, the agency’s track record indicates these concerns are far from academic. A May 1993 Report from a subcommittee of the House Committee on Energy and Commerce contained several case studies in which the FDA had awarded PMA to unsafe devices, and attributed these failures to an unwillingness or inability on the part of the FDA to compel manufacturers to provide sufficient data and to critically evaluate the data provided. See Less Than the Sum of Its Parts: Reforms Needed in the Organization, Management, and Resources of the Food and Drug Administration’s Center for Devices and Radiological Health, Report by the House Subcommittee on Oversight and Investigations of the Committee On Energy and Commerce, at 1-3, 21 (Comm. Print 103-N 1993). For example, the FDA granted. PMA to bovine collagen in, 1981, despite numerous flaws in the *131 clinical data, including the company’s failure to submit safety information appropriately. Id. at 23. The FDA also failed to take prompt action when the company marketing the device underreported adverse reactions and made unreported, misleading labeling changes. Id. at 24. Because of disputes over procedure between the FDA and the company, it was not until 1990 that the FDA required the company to conduct an analysis of complaints associated with bovine collagen use. Id. at 24. In 1991, the FDA recognized that there was an association between the use of bovine collagen and autoimmune responses, including serious diseases. Id. at 24. The report also includes other examples of the FDA’s failure to recognize and respond to risks associated with medical devices. Id. at 21-34. Thus, there is reason for concern if FDA oversight is the only incentive to improve the safety of medical devices.
The majority considers these concerns to be mere policy matters to be left to Congress and irrelevant to the legal analysis of preemption. Maj. op at 120, 124-25. I note these issues only to highlight how the majority’s holding fails to consider Congress’s intent to protect consumers. Because the Supreme Court has instructed us that Congress’s intent is the ultimate touchstone of preemption analysis, Cipllone, 505 U.S. at 516, 112 S.Ct. 2608, I cannot consider it to be irrelevant to the legal analysis in this case.
If Congress’s goal in passing the MDA was to protect consumers, as it seems clear it was, then it is unlikely that it intended to preempt all state tort claims for design or labeling defects whenever a device has gone through the PMA process. Thus, I believe we must recognize a particularly strong presumption against preemption in this case.
II.
With these principles in mind, I turn to whether the particular state tort claims in this case are expressly preempted by Section 360k(a). To make this determination, the Supreme Court has instructed that we conduct “a careful comparison between the allegedly pre-empting federal requirement and the allegedly pre-empted state requirement to determine whether they fall within the intended pre-emptive scope of the statute and regulations.” Lohr, 518 U.S. at 500, 116 S.Ct. 2240. Because the lack of any device-specific federal requirement makes it impossible to make such a “careful comparison” with the state tort claims in this case, I would find the Rie-gels’ claims have not been preempted.
I agree with the majority that Lohr requires us first to determine whether the PMA process imposes a device-specific federal requirement on the Evergreen Balloon Catheter. Both the majority and concurring opinions in Lohr relied on the FDA regulation regarding the scope of preemption under the MDA to reach the conclusion that the federal requirement must be specific. 518 U.S. at 500, 116 S.Ct. 2240 (Noting the “overarching concern that preemption occur only where a particular state requirement threatens to interfere with a specific federal interest”); id. at 507, 116 S.Ct. 2240 (Breyer, J., concurring) (“[T]he regulation’s word ‘specific’ does narrow the universe of federal requirements that the agency intends to displace at least some state law.”). Those regulations state that preemption will occur only when the agency “has established specific counterpart regulations or there are other specific requirements applicable to a particular device under the act.” 21 C.F.R. § 808.1(d).
Despite the fact that the PMA process focuses on safety and effectiveness while the 510(k) process focuses only on substan *132 tial equivalence, whatever requirements, if any, the PMA process imposes on a device are no more specific than those imposed by the 510(k) process. See Goodlin, 167 F.3d at 1376; Sowell v. Bausch & Lomb, Inc., 230 A.D.2d 77, 656 N.Y.S.2d 16, 20 (App.Div.1997). And although the PMA procesa involves a rigorous and intensive review of a device, neither that review nor eventual approval imposes any ascertainable requirement upon the device that could be compared to any state requirement. See Goodlin, 167 F.3d at 1374-75.
The FDA’s approval constitutes no more than a finding that the manufacturer has met the FDA’s minimum requirements to show a device’s safety and effectiveness. Cf. 21 C.F.R. § 814.45 (listing bases for denial of PMA); see also Goodlin, 167 F.3d at 1375.[21] It does not represent a reasoned consideration and rejection by the agency of possible alternative, safer designs. If the facts showed that the FDA had actually rejected the design improvement advocated by the Riegels’ through their tort claims, this might be a different case. However, here the FDA simply issued a generic approval letter. [JA at 112-13] Indeed, if the FDA were to determine that a particular device should be subject to substantive requirements, then it has the power to promulgate performance standards to that effect. See 21 C.F.R. § 861.1(b)(3). Such performance standards, unlike PMA, would obviously constitute specific federal requirements with preemptive effect.
The majority argues that the device at issue “was subject to the federal device-specific requirement of complying with the particular standards set forth in its approved PMA application.” Maj. Op. at 119. To support this proposition, the majority places substantial reliance on the fact that, once PMA has been granted, the manufacturer cannot make any changes that affect the safety and effectiveness of the device without further FDA approval. Maj. Op. at 119. Yet, because the manufacturer always retains the ability to submit a PMA supplement to request approval of changes, see 21 C.F.R. § 814.39(a), the FDA cannot realistically be said to have required a manufacturer not to adopt a specific change until the manufacturer requests approval and is rejected. In fact, a manufacturer can even make certain changes that would enhance safety prior to getting FDA approval. See id. § 814.39(d). Thus, I simply cannot conclude that “complying with the particular standards set forth in its approved PMA application” constitutes a specific federal requirement. The FDA “did not ‘require’ [the Evergreen Balloon Catheter] to take any particular form for any particular reason.” Lohr, 518 U.S. at 493, 116 S.Ct. 2240.
Treating a specific design or label as a requirement when the FDA might well approve a change as an improvement in safety removes any incentive for manufacturers to promptly alert the FDA to the need for changes as new safety data becomes available. See Brooks v. Howmedica, Inc., 273 F.3d 785, 800-01 (8th Cir.2001) (in banc) (Bye, J., dissenting) (arguing there should be no preemption of claim premised on the failure to warn about risk discovered after PMA when no labeling change was sought); see also Bates, 125 S.Ct. at 1802 (“[T]he specter of damage actions may provide manufacturers with *133 added dynamic incentives to keep abreast of all possible injuries stemming from use of their product so as to forestall such actions through product improvement.”).
For the same reasons, the majority’s attempt to distinguish the limitation on changes after Section 510(k) approval, which was found not to create a requirement in Lohr, is unpersuasive. The fact that, after PMA, FDA approval is required for any change affecting the safety or effectiveness of the device, rather than only for a significant change, does not make the federal requirement any more specific nor does it mean the manufacturer is required not to make changes to improve the safety of the device.
III.
Because I would find the PMA process does not impose any federal device-specific requirement, there is no need for me to reach the question of whether state tort claims would be preempted by such a requirement. The majority finds the Rie-gels’ claims for negligent design, strict product liability, breach of implied warranty, and loss of consortium have been preempted because PMA requires Med-tronic not to alter the design, manufacturing, or labeling of the Evergreen Balloon Catheter. Despite the purpose of the MDA to protect consumers, I agree with the majority that at least some state tort claims could be preempted because they can impose “requirements” that are different from or in addition to the federal requirements. See Bates, 125 S.Ct. at 1798 (holding in the context of a different preemption provision that “the term ‘requirements’ ... reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties”). Nevertheless, because there is no specific federal requirement to compare to these state claims, and nothing prevents Med-tronic from improving the design, manufacturing, or labeling of the Balloon Catheter, I would not find these claims have been preempted.
IV.
For the foregoing reasons, I respectfully dissent from the majority’s finding of preemption. I do agree, however, that summary judgment was properly granted as to the Riegels’ negligent manufacturing claim and concur in that portion of the judgment.

. The majority argues that the agency is free to change its position provided it gives a reasoned analysis. Maj. op at 125 While I assume this is true, it does not undermine the probative value of the agency's‘prior understanding in discerning congressional intent.

. While it is true, as the majority points out, that if the manufacturer becomes aware of new information regarding the safety of the device, then it is required to report that information to the FDA. Maj Op. 124 This does not change the fact that, if all design claims are preempted, the manufacturer need not seek out safety-related innovations and, even in light of data indicating dangers, is free to remain entirely passive about improving safety until the FDA requires it to do so.

. As discussed above, this was the precise position of the FDA for more than twenty years after the passage of the MDA. See Brief for United States as Amicus Curiae at 15, Smiths Indus. ("[T]hose general [PMA] criteria establish minimum standards that do not displace state law standards of care of common law duties respecting the medical device.”).