**Evangeline RED, et al.**

v.

**KRAFT FOODS, INC., et al.**

**Case No. CV 10–1028–GW(AGRx).**

United States District Court, C.D. California.

Nov. 18, 2010.

Gregory S. Weston, Jack Fitzgerald, for Plaintiffs.

Dean N. Panos, for Defendants.

**PROCEEDINGS: DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6) (filed 10/01/10)**

GEORGE H. WU, District Judge.

For reasons stated on the record, the above-entitled action is consolidated with CV 10–7301–GW(AGRx) for all further proceedings.

Court hears further oral argument. The Court's tentative ruling previously circulated on November 4, 2010, is hereby adopted as its final ruling. Defendant Kraft Foods Global, Inc.'s Motion to Dismiss Second Amended Complaint Pursuant to Rules 12(b)(6), is **denied without prejudice** not barring defendants from making any additional motions to dismiss.

Any dispositive motions will be held on **January 10, 2010 at 8:30 a.m.** Parties may stipulate to the briefing schedule, except the reply, which will be filed by noon on January 3, 2011.

The Court's tentative ruling is circulated and attached hereto. Court hears oral argument.

For reasons stated on the record, Defendant Kraft Foods Global, Inc.'s Motion to Dismiss Second Amended Complaint Pursuant to Rules 12(b)(6), is continued to

**November 18, 2010 at 8:30 a.m.** Plaintiff's supplemental brief is due by November 9, 2010. Defendants' response is due by November 12, 2010.

## I. Background

In their Motion to Dismiss the Second Amended Complaint, Defendants are once again making the preemption argument that the Court more or less ruled on at the last hearing. While the Court did permit Defendants "to reargue it if you have case law for it," *see* September 16, 2010 Transcript at 4:17, it also indicated in its tentative ruling that Defendants should not "repeat any of the arguments that have been addressed here or in the Court's previous tentative rulings." Doc. No. 59 at 3. There is no really new argument that is made in Defendants' latest round of briefing, and the case they principally rely on, *In re Pepsico, Inc., Bottled Water Marketing and Sales Practices Litigation,* 588 F.Supp.2d 527 (S.D.N.Y.2008) ("*In re Pepsico*"), was first cited in their motion filed on May 26, 2010. *See* Doc. No. 29. It clearly is time to move on, but some questions need to be briefly revisited.

As discussed in greater detail in the Court's previous tentative rulings, the FDCA includes a provision that expressly preempts state regulation of specific topics related to food labeling and provides that states may not establish any requirement respecting these specified topics "that is not identical" to the requirements in the FDCA in certain categories. 21 U.S.C. § 343–1(a). The NLEA's rule of construction concerning the scope of preemption excludes implied preemption, providing in relevant part that, "[t]he [NLEA] shall not be construed to preempt any provision of State law, unless such provision is express-ly preempted under section 403A of the [FDCA]." Pub. L. No. 101–535, § 6(c)(1), 104 Stat. 2353, 2364; *see also In re Farm Raised Salmon Cases,* 42 Cal.4th 1077, 1091, 72 Cal.Rptr.3d 112, 175 P.3d 1170 (2008) ("Congress made clear that the preemptive scope of section 343–1 was to sweep no further than the plain language of the statute itself.").

Previously, this Court found that Defendants' labeling claims of "no cholesterol" and specific quantities of "whole grain" per serving were not actionable on the ground that they are preempted by federal law, but found that more general representations regarding the healthfulness of defendants' products were not preempted.

Although it never did so in any of its written tentative rulings, this Court at one time indicated from the bench that it would only allow Plaintiffs' lawsuit to proceed to the extent that they could demonstrate that it was not solely predicated upon the presence of artificial trans fat in Defendant's products. As explained in the previous tentative, however, the mere fact that Plaintiffs' claims may be predicated upon the presence of artificial trans fat does not mean that all of their claims are preempted. Some of the claims in Plaintiffs' original Complaint *were* obviously preempted, and these have been stricken from the current pleading. It is noted that the SAC now also contains—probably in response to the Court's comments—claims related to the presence of other supposedly harmful ingredients, such as highly refined sugar, white flour, high fructose corns syrup ("HFCS") and the manufactured food additives disodium 5'—guanylate ("DG") and monosodium glutamate ("MSG"), besides trans fat.[1] It also

---

1. In the SAC, Plaintiffs to a great extent substitute the term "partially hydrogenated vegetable oil" ("PHVO") for "trans fat," which Defendants characterize as a putative attempt to avoid preemption. Defendants' complaints about this practice would be moot unless references to trans fat alone would render the complaint deficient—which they would not.

includes references to representations about other ingredients (such as descriptions of "graham" and "honey") that probably would be subject to the same analysis as the "made with real vegetables" claim that has already been discussed in this Court's earlier tentative ruling, but which the court may revisit after considering the reasoning of another court faced with the same issue in the recent decision in *Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d 1111, 2010 WL 4055954, 2010 U.S. Dist. LEXIS 111981 (N.D.Cal. Oct. 14, 2010).

## II. Discussion

### A. *In re Pepsico*

*In re Pepsico* does not strongly support Defendants' preemption argument. Although it contains language that would encourage a very broad reading of the express preemption provisions in section 403A of the FDA,[2] its actual preemption analysis is fairly finely focused. At issue in *In re Pepsico* was whether claims that defendants "fraudulently misrepresented the source of Aquafina water by using a label designed to create the impression that the water came from a mountain source and failing to inform consumers that the true source of Aquafina water was public drinking supplies commonly known as 'tap water' " were preempted by Section 403A of the FDCA. 588 F.Supp.2d at 530. The court there wrote:

> In order to resolve this dispute, the Court must first analyze the FDCA's labeling requirements for bottled water meeting the standard of identify for "purified water," and then determine whether Plaintiffs' state law causes of action impose any "requirement . . . that is not identical to" those of the FDCA.

21 U.S.C. § 343–1(a)(1). If it is determined that Plaintiffs' state law causes of action "impose[ ] a broader obligation than [federal law]," then they are preempted. [Citation].

*Id.* at 536.

After noting that purified water" was explicitly exempted from having to disclose its source under 21 C.F.R. § 165.110(a)(3)(ii), and taking into consideration the drafting history of that regulation, the court found that "while it is clear that the FDA contemplated that marketing techniques could potentially mislead consumers into believing that bottled water sourced from municipal supplies was actually 'spring water,' it is also evident that the FDA determined that such concerns are irrelevant in the context of purified water." *Id.* at 536–37. It further stated:

> In sum, the FDA never intended or required that purified water include the "municipal water supply" disclosure required for certain other types of water, including spring water, and was not concerned with any misleading potential of graphics on bottles of purified water, based on its conclusion that with respect to purified water, the purification, and not the source, is the reason consumers buy it. Consequently, Plaintiffs' claims are expressly preempted under both of their theories because: (1) federal law is not silent on the subject of implied labeling misrepresentations regarding the municipal source of bottled water; and (2) given that the Aquafina label fits within the exception for purified water and thus complies with the FDCA's requirements, Plaintiffs' state law claims

---

**2.** The court in *In re Pepsico* found that the NLEA's rule of construction concerning the scope of preemption does *not* exclude implied preemption under section 403A, but, rather, "refers to the express preemption provision of Section 403A solely for the purpose of exempting it." 588 F.Supp.2d at 533 n. 4. That appears to be a somewhat odd reading of the statute.

by necessity are premised on requirements that are not parallel to those imposed by federal law.

*Id.* at 537.

The analogy that Defendants would have the Court draw is this: that the FDA's decision that purified water bottles need not disclose the source of the water even if the label depicts a mountain setting is like its decision that products should disclose less than 0.5 grams per serving artificial trans fat as ".0 grams" even if their labels portray the products as being good for you. But in regulating purified water, the FDA explicitly determined that its source was immaterial to consumers. It obviously has not determined that whether products are bad for you is immaterial. The court in *In re Pepsico* even noted in a footnote that state law claims might survive preemption "where they are premised on misrepresentations concerning subject matter that the FDA has not endeavored to regulate," giving as examples "the hypothetical circumstances of labeling misrepresentations concerning purified water's ability to clear up the drinker's acne or increase the drinker's intelligence." *Id.* at 538 n. 10. Plaintiffs' contention that Defendants' product labels implicitly suggest that its products are healthful are arguably more like those hypothetical than they are like misleading consumers about the source of purified bottled water where the FDA has determined that the source is immaterial.

### B. *Chacanaca v. Quaker Oats*

The Court would also address Defendants' arguments about Plaintiffs' allegations based on the claim "made with real vegetables" (which have always been part of this case) and their allegations based on claims about the presence of honey, molasses, and graham flour (which are new to the SAC) in light of the recent decision by Judge Richard Seeborg in *Chacanaca v. Quaker Oats,* a case that also involves labeling claims that are supposedly false or misleading in light of the presence of artificial trans fat in defendants' products. Judge Seeborg's conclusions were consistent with those of this Court except in the following respect. Along with the "0 grams trans fat" statement and the "good source"[3] statements, Judge Seeborg found that the plaintiff's claims based on a statement indicating that defendant's product contains whole grain oats was also preempted. (Essentially, Judge Seeborg found that this representation was akin to a reference to a specific amount of a nutrient—such as in the "whole grain" claims in this case that this Court *has* held to be preempted). If this conclusion is correct, it might affect several of the allegations in this case.

In reaching this conclusion, Judge Seeborg characterized the inclusion in the label of the phrase "made with whole grain oats" as an implied nutrient content claim. 21 CFR 101.13(b)(2)(i)-(ii) provides:

---

**3.** In an earlier tentative, this Court had indicated that the statement "a good source of Calcium, Iron & Zinc" might not be expressly preempted. That may have been incorrect for the same reasons given with respect to the "no cholesterol" and whole grain" claims. 21 C.F.R. § 101.54 sets out exact specifications making "good source" claims. To impose a requirement that they cannot be made when a food contains trans fat would be to impose a requirement "that is not identical" to these specifications and would therefore contravene the express preemption provision of 21 U.S.C. § 343–1(a). The SAC does not include any allegations relating to Defendants' "good source" claims except for the statement that Teddy Grahams products are a "good source of Calcium, Iron & Zinc to Help Support Kids' Growth and Development." As noted elsewhere in this memorandum, the Court probably would find that Plaintiffs are entitled to allege that the claim that Teddy Grahams "support kids' growth and development" is potentially (for purposes of pleading) misleading even though it is tied to the "good source" statement.

(2) An implied nutrient content claim is any claim that:

(i) Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or

(ii) Suggests that the food, because of its nutrient content, may be useful in maintaining healthy dietary practices and is made in association with an explicit claim or statement about a nutrient (*e.g.,* "healthy, contains 3 grams (g) of fat").

Judge Seeborg wrote:

As to oats, a simple statement of an ingredient need not necessarily count as a nutrient content claim. The FDA has instructed, however, that it may function as such a claim under some circumstances. The court in *Ackerman v. Coca–Cola* in fact relied on the statement "high in oat bran" as an example of an implied nutrient content claim because it also suggested a high dietary fiber content. 2010 WL 2925955 at *3, 2010 U.S. Dist. LEXIS 73156. Plaintiffs, for their part, insist that the oat claim is an implied content claim intended to convey that Chewy Bars are part of a healthful diet, notwithstanding the fact that they contain hydrogenated vegetable oil.

\* \* \*

The federal regulatory statute provides for this precise scenario: that is, it categorizes as misleading and therefore prohibited even true nutrient content claims if the presence of another "disqualifying" nutrient exceeds an amount established by regulation. The Agency has by regulation imposed "disqualifying" levels for only four nutrients: total fat, saturated fat, cholesterol, and sodium. 21 C.F.R. §§ 101.13(h)(1), 101.14(a)(4).

*Id.* at 1121–23, at *7–8, 2010 U.S. Dist. LEXIS 111981 at *24–26.

■ Here, Plaintiffs argue persuasively that two phrases at issue in this case—*i.e.,* "Made with Real Vegetables" and "Made with Real Ginger and Molasses"—do not meet the definition of implied nutrient content claims because they do not suggest "that a nutrient is absent or present in a certain amount" or make an explicit claim like that in the "healthy, contains 3 grams (g) of fat" example given in § 101.13(b)(2)(ii). Thus, they are not subject to the "disqualifying nutrient" levels discussed in *Chacanaca.* If Plaintiffs are correct that the phrases "Made with Real Vegetables" and "Made with Real Ginger and Molasses" are not implied nutrient claims within the regulatory meaning, and are not subject to the "disqualifying" nutrient levels set out in 21 C.F.R. §§ 101.13(h)(1), 101.14(a)(4), there would be no obvious argument for express preemption.

Once again, unless such disqualifying nutrient levels do apply, Defendants' contention that Plaintiffs' claims are preempted because the FDA has not adopted a disqualifying level for trans fat is an argument for implied, not express, preemption.

### C. *"Characterizing Flavor" Regulations*

■ Defendants also raise a new argument that the challenged words and images concerning vegetables, honey, molasses and ginger are preempted because they comply with the FDA's "characterizing flavor" regulations at 21 C.F.R. § 101.22(i). Defendants argue that because they have complied with FDA regulations regarding the depiction by words or images of the ingredients responsible for the products' flavors, claims that those depictions misled Plaintiffs seek to impose requirements that are "not identical" to federal food-labeling requirements under the NLEA. This is a somewhat difficult

issue to parse and the parties' briefs devote relatively scant attention to it.

With regard to the "real vegetable" claims, some of the depictions on the product labels arguably refer simply to characterizing flavor, while the phrase "Made With Real Vegetables" appears to refer to the products' supposed constituent ingredients and not to flavor. In the case of Vegetable Thins, Plaintiffs allege that this statement is misleading because Vegetable Thins contain "virtually no carrots, tomatoes, onions, or red bell peppers" and "contain more partially hydrogenated vegetable oil than all the pictured vegetables on the label combined." SAC ¶ 83. With respect to Ritz Crackers Roasted Vegetable they allege that it is misleading "because the product "contains more partially hydrogenated vegetable oil than it does all of the vegetables pictured on the box." *Id.* at ¶ 94. Reading the allegations of the Complaint in the light most favorable to the Plaintiff, the Court probably should view the statement "Made with Real Vegetables" on the product labels as representations about the products' ingredients and not their characterizing flavor.[4] If they are viewed simply as "characterizing flavor," claims, however, Defendants' preemption argument becomes somewhat stronger.[5]

The phrase "Made with Real Ginger & Molasses" in Defendants' Ginger Snaps product arguably refers to characterizing flavor—despite the use of the phrase "made with"—but Plaintiffs are alleging that it is intended to convey to the consumer that Ginger Snaps are "made and sweetened with natural substances." Similarly, Plaintiffs allege that Honey Maid's product name, the prominent second use of the word "Honey" directly below it, and the prominent image of flowing honey are intended to convey the message that Honey Maid Graham Crackers are primarily sweetened with honey and not that they are "honey flavored." The Court would decline to construe these usages as mere representations of "characterizing flavor." Defendants have not clearly shown how Plaintiffs' claims that are based on them might be preempted under the NLEA.

This might, though, be a more complicated issue than either side acknowledges. Plaintiffs appear to implicitly concede that, if the labeling claims in question are "characterizing flavor" claims and they are compliant with FDA regulations, then Plaintiffs' claims would be barred. Who gets to decide whether a product labeling claim is a "characterizing flavor" claim or a claim about the product's ingredients, or an implicit claim that a product is healthful because it contains a particular ingredient? If a "flavor" claim suggests health benefits (especially in conjunction with other labeling claims), are Plaintiffs barred from alleging that it is misleading? The allegations relating to these claims seem to be a relatively small part of Plaintiffs' case and no cause of action depends on them. It may be that these questions do not have to be resolved at the pleading stage.

Defendants have not, on preemption grounds, challenged Plaintiffs' allegation that the product name and package of

---

4. Query, is there a taste that is associated with "real vegetables?"

5. Plaintiffs assert that, even if they are considered statements of "characterizing flavor" subject to regulation under § 101.22(i), claims based on these statements would still not be preempted because "they violate the regulation." Plaintiffs' argument in this regard is not sufficiently developed, however, and in any event the SAC does not allege that the statements do not comply with § 101.22(h)(1). (It should probably be noted that Defendants' argument that the statements do comply with the regulations pertaining to "characterizing flavor" claims is not particularly persuasive).

Teddy Grahams and Honey Maid Grahams are misleading because they falsely claim that it is a graham product—*i.e.*, that it is made from graham flour—even though it is primarily made from heavily refined white flour. SAC ¶¶ 164, 118. (This allegation, too, is new to the SAC). As discussed below, Defendants do argue that their packaging cannot be misleading in this regard because it is literally true that the products contain some graham flour.

All of this is somewhat far afield from what was initially, and apparently is still, the main thrust of Plaintiffs' complaint. At this point, these allegations would be allowed to stand. Again, even if they were stricken from the SAC, it would not be fatal to any of Plaintiffs' causes of action.

### D. *"Good Source" Claims*

■ Defendants also argue that Plaintiffs' claims based on representations that Teddy Grahams products are a "good source of Calcium, Iron & Zinc to Help Support Kids' Growth and Development" are preempted. The requirements for making a "good source" claim are set forth at 21 C.F.R. § 101.54(c)(1). As noted above, to impose the additional requirement that "good source" claims cannot be made when a product contains trans fat would contravene the express preemption provision at 21 U.S.C. § 343–1(a). The issue is whether it is possible to separate the assertion that Teddy Grahams "Help Support Kids' Growth and Development" from the "good source" claim. The Court would find that (1) Plaintiff's have plausibly alleged that the representation that Teddy Grahams help support kids' growth and development is misleading, and (2) this claim is not preempted.

### E. *Whether Plaintiffs' claims are based on non-actionable puffery.*

Defendants next argue that the labeling statements at issue in this lawsuit are not actionable because they are either factual-

ly true or non-actionable puffery. The Court has previously rejected both of these arguments in the context of a motion to dismiss. Defendants make what seems to be at least one new argument in regard to the "factually true" statements when they argue that the SAC cannot allege that Defendants omitted any material fact that would render their factually true statements—viz., "made with real vegetables," "made with ginger and molasses," and the use of the words "honey" and "graham"— misleading because federal regulations do not require them to disclose sub–0.5g of trans fat. Once again, the Court will resist Defendants' attempt to characterize Plaintiffs' claims as being based on a failure to disclose that each serving contains between 0 and 0.5 grams of trans fat.

Defendants also argue that the other non-trans fat ingredients that Plaintiffs claim to be unhealthful were accurately disclosed on the packaging. This does not necessarily prevent Plaintiffs from being able to allege that Defendants' labeling claims are deceptive in other regards.

As the Ninth Circuit has observed, "the California Supreme Court has recognized that [the UCL, FAL and CLRA] prohibit not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir.2008) (citing *Kasky v. Nike, Inc.*, 27 Cal.4th 939, 951, 119 Cal.Rptr.2d 296, 45 P.3d 243 (2002)). The fact that Defendants were not obligated to disclose (or could not have disclosed) the presence of sub–0.5 g. amount of trans fat under the applicable regulations does not necessarily negate Plaintiffs' claims.

Defendants' argument about the statements that were supposedly "puffery" has been extensively addressed at previous hearings. It would again be rejected.

### F. *Standing*

Defendants also raise a new argument concerning Plaintiffs' supposed lack of Article III standing "because they have not suffered a cognizable injury-in-fact," Mot. 23:8–9, and repeat an argument from their first motion to dismiss in which they asserted that Plaintiffs had not alleged an "economic injury" as required under the UCL, FAL, and CLRA. Defendants principally rely on the case of *Wright v. General Mills, Inc.*, 2009 WL 3247148, 2009 U.S. Dist. LEXIS 90576 (S.D.Cal. Sept. 30, 2009). There, the district court found the allegation that, as a result of defendant's conduct, plaintiffs purchased, purchased more of. or paid more for, defendants products to be insufficient to allege an injury under federal pleading standards. *See id.* at *5, 2009 U.S. Dist. LEXIS 90576 at *14. It hardly needs to be said that many courts have found similar allegations to be sufficient. *See, e.g., Chavez v. Blue Sky Natural Bev. Co.*, 340 Fed.Appx. 359, 361 (9th Cir.2009); *Von Koenig v. Snapple Bev. Corp.*, 713 F.Supp.2d 1066, 1078–79 (E.D.Cal.2010); *Chacanaca v. Quaker Oats Co.*, 752 F.Supp.2d at 1124–26, 2010 WL 4055954 at *10–11, 2010 U.S. Dist. LEXIS 111981 at *34–35.

### III. Conclusion

Defendants' Motion to Dismiss the SAC is DENIED to the extent described herein.